# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

JUN 1 5 2007

JOHN F. CORCORAN, CLERK
BY: ~~~~~~~
DEPUTY CLERK

|  |  |  |
|---|---|---|
| MARK A. VIAR, | ) | |
| | ) | |
| *Plaintiff* | ) | Civil Action No. 5:06cv00095 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| MICHAEL J ASTRUE, [1] | ) | |
| Commissioner of Social Security, | ) | By:  Hon. James G. Welsh |
| | ) | United States Magistrate Judge |
| *Defendant* | ) | |
| | ) | |

The plaintiff, Mark A Viar, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying his claim for a period of disability insurance benefits ("DIB") under Title II of the Social Security Act, as amended, ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

By order of referral entered February 2, 2007, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The plaintiff's motion for summary judgment and supporting memorandum addressing the reasons why he believes the final decision of the Commissioner is not supported by substantial evidence was filed on or about February 16, 2007.  The Commissioner having now filed his motion for summary judgment and supporting brief,

---

[1]

On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.  Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, and 28 U.S.C. § 405(g) he is substituted, in his official capacity, for Jo Anne N. Barnhart, the former Commissioner.

the undersigned having heard the views of counsel and the undersigned having now reviewed the administrative record, the following report and recommended disposition are submitted.

Contending that he is disabled [2] due to the chronic residual effects of a work-related back injury in September 1998, including significant permanent weakness and numbness of the left lower extremity, chronic low back pain and multiple postural limitations (R.69,78-102,103-194121-128,129-130,132, 138-141,145-148,152, 153,432-455), the plaintiff argues that the adverse decision of the administrative law judge ("ALJ") was based *inter alia* on a flawed assessment of the medical evidence and on flawed vocational testimony. The Commissioner, on the other hand, argues that the administrative record contains substantial evidence supporting the ALJ's non-disability decision, including the absence of any disability finding by a medical source, the plaintiff's "recreational activities" and "fairly active" lifestyle, and the vocational testimony given in response to a hypothetical question which fairly summarized the plaintiff's functional abilities and limitations.

## I.    Standard of Review

The court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the conditions for entitlement established by and pursuant to the Act. If such substantial evidence exists, the final decision of the

---

[2] "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

2

Commissioner must be affirmed. *Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990); *Laws v. Celebrezze*, 368 F.2$^d$ d 640, 642 (4th Cir. 1966).

"Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F3$^d$ 171, 176 (4th Cir. 2001) (*quoting Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3$^d$ at 176 (*quoting Laws v. Celebrezze*, 368 F.2$^d$ 640, 642). "In reviewing for substantial evidence, [the court should not] undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. (*quoting Craig*, 76 F.3$^d$ at 589). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

## II.   Administrative History

The record shows that the plaintiff filed his application for DIB on or about May 25, 2004 alleging disability due to a significant medical condition that became disabling on March 18, 2004. (R.66-68). His claim was denied, both initially and on reconsideration. (R.30-41). Pursuant to a timely request, an administrative hearing on his application was held on February 2, 2006 before an ALJ.

(R.42-43,45-50,52-65,496). At the hearing, the plaintiff was present, testified and was represented by counsel. (R.44,51,65,496-519).

Utilizing the agency's standard five-step inquiry,[3] the plaintiff's claim was denied by written administrative decision on June 1, 2006. Therein, the ALJ found that the plaintiff met the Act's insured status requirements, at least through the date of the decision, and had not engaged in substantial gainful activity at any decisionally relevant time. (R.20).

At step-two the ALJ concluded that the medical evidence established the plaintiff's musculoskeletal condition to be vocationally relevant and a "severe" impairment[4] within the meaning of the Act. (*Id.*).

At step-three, the ALJ determined that the plaintiff's condition neither met nor was medically equivalent to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). In reaching this

---

[3] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether the individual engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry requires a determination of whether, based upon the medical evidence, the individual has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the individual has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the person is disabled; if not, step-four is a consideration of whether the person's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the individual from performing other work. 20 C.F.R. § 404.1520(f).

[4] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *See also* 20 C.F.R. § 404.1520(c).

4

conclusion, the ALJ stated that he was relying upon the functional capacity assessment of state agency medical consultants (R.420-427), who had previously reviewed the then available medical records, and on the more recently submitted pre-hearing treatment records. (R.20). *See* Social Security Ruling ("SSR") 96-6p. This conclusion was reached, however, without a particularized analysis either by the state agency medical consultants or the ALJ to determine whether the plaintiff's impairment met or equaled a specific listed impairment. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

Based on his review of the entire record, including the medical evidence and the plaintiff's hearing testimony, the ALJ found the November 2004 and January 2005 functional capacity assessments of the state agency consultants to be "generous" and to have "adequately accommodated" the plaintiff's limitations. (R.21-27). After further finding that the plaintiff's condition could reasonably be expected to produce "some residual intermittent pain and symptoms" and that he could not functionally perform any of his past relevant work, the ALJ found that the plaintiff retained the exertional ability to perform "a wide range of light work." (R.27-28).

After the ALJ's issuance of his adverse decision, the plaintiff made a timely request for Appeals Council review and, by counsel, submitted additional evidence and letter memoranda in support of his appeal request. (R.14-15,477-495). This request was subsequently denied (R.8-10), and the ALJ's unfavorable decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

### III.    Facts

5

The plaintiff was born in 1961 and was forty-five years of age [5] at the time of the administrative

decision. (R.66,99,499). He has a limited education, having completed only the eleventh grade in

school (R.110,499). His relevant work in the past was primarily as a truck driver with freight handling

duties and as a warehouse forklift operator. (R.105,113,154,500,518). As performed by then plaintiff,

his work as a forklift operator was heavy in exertional level, and his work as a freight handling truck

driver was exertionally very heavy. (R.115-118,519). See 20 C.F.R. § 404.1567(d)-(e). Both jobs were

described by the vocational witness as semi-skilled. (R.519-520)

On September 24, 1998, the plaintiff sustained a work-related back injury with attendant left leg

redicular symptoms. (R.79-80,219-226,260). Shortly thereafter, he sought orthopaedic treatment from

Dr. Wm. Lee Hereford for this injury. [6] (R.80,260,360,365-367). After a period of conservative

treatment, including a trigger point injection and physical therapy which provided only partial relief,

and a negative electromyogram ("EMG") the plaintiff was referred to Dr. Peter Puzio for a neurologic

examination. (R.200-204,260,361,409-414). Based on the plaintiff's clinical presentation, Dr. Puzio

recommended that the plaintiff remain off work, continue on Dr. Hereford's prescribed medication

regime, and undergo a lumbar spine MRI. (R.413-414).

Follow-up radiographic studies (MRI and X-rays) in December reconfirmed the plaintiff's

---

[5] At this age the plaintiff is classified as a "younger worker" under 20 C.F.R. § 1563(c).

[6] Dr. Hereford's office records show that the plaintiff had been previously treated for a twisting injury to his
right knee in 1994 (R.388-389) and for a 1996 "pulling type" injury to his back with right leg radiculopathy. (R.368-
388). In connection with this back injury, the plaintiff underwent a lumbar spine MRI in October 1996 which
demonstrated degenerative disc disease at L3/4 with a small broad-based central disc protrusion and at L4/5 with a
diffuse disc protrusion. (R.398-400). A subsequent lumbar myelogram CT study in March 1997 confirmed the prior
MRI findings. (R.395-396).

6

significant degenerative lumbar disc disease and "prominent" herniated disc at L4/5 with "marked compression of the thecal sac." (R.415-418). After a period of additional conservative treatment, including physical therapy, medications and light-duty work efforts, the plaintiff "improved;" he was "released to full duty" on January 25, 1999, and he returned to work the following month. (R.79,260,353-364, 403-407).

Eleven months later, Dr. Hereford saw the plaintiff on for treatment of a knee-twisting injury, and at that time it was noted that the plaintiff exhibited "chronic numbness of the left [leg]" due to a herniated lumbar disc. (R.86-87,216-218,352).

In February 2001, the plaintiff experienced a significant exacerbation of his symptoms, including weakness, numbness, loss of strength, and pain. (R.260-261,347-351). Given the plaintiff's persistent complaints of low back pain and attendant left leg radiculopathy and parasthesis since his work-related injury in 1998, Dr. Hereford concluded that the plaintiff had a "permanent" impairment due to left leg numbness and reduced range of motion related to a "chronic" L4/5 disc herniation [7] and recommended surgical intervention. (R.343,345,393- 394,86-87,124-125,129-130,132,138,145).

Given the plaintiff's permanent sensory dysfunction, in March 2001 Dr. Hereford recommended lumbar fusion surgery. (R.333,343,87). After a separate review of the plaintiff's medical records, radiographic studies and a clinical orthopaedic evaluation in April 2001, Dr. Paul DiMartino concluded

---

[7] As the Virginia Workers' Compensation Commission noted in its 05/23/2003 decision, "The evidence clearly shows a permanent impairment caused by the 1998 accident." (R.89).

7

further conservative management would not produce any additional medical improvement and recommended a "simple" L4/5 discectomey. (R.260-262,339,343).

Consistent with Dr. DiMartino's recommendation, the plaintiff agreed to an L4/5 discectomy which was performed by Dr. Hereford on May 14, 2001. (R.265-297,331-333). His post-operative recovery was uneventful, and he returned to work . (R.104,107,327,329-330).

In December 2001, Dr. Hereford noted that the plaintiff continued to have residual symptoms, including chronic pain, loss of strength and weakness, and at that time he estimated these residuals to result in the plaintiff's twenty-five percent (25%) loss of use of his left lower extremity. (R.88-89,328-329).

Fifteen months later, in March 2003, the plaintiff returned to Dr. Hereford with renewed complaints of acute low back pain and left lower extremity radiculopathy. (R326). An EMG study on March 31 "reveal[ed] acute as well as chronic denervation of the left L4 and L5 dermatome." (R.325-326). Dr. Hereford's later office records show that he continued to treat the plaintiff conservatively for his "recurrent" and "persistent" left leg pain and weakness associated with lumbar nerve root irritation. (R.320-327).

A repeat MRI scan in December 2003 re-confirmed an "L4/5 foraminal disc herniation with moderate compression of the nerves," and Dr. Hereford renewed his recommendation for spinal fusion surgery. (R.321,456). When seen by Dr. Hereford on March 18, 2004, the plaintiff reported the loss of

8

all feeling in his left leg, as well as persistent left leg weakness and permanent left knee and low back pain. (R.318-319). On that date, the plaintiff was medically excused from work for four months, and surgery was scheduled. (R,320).

On April 5, 2004, the plaintiff underwent an L4/5 laminectomy,[8] discectomy,[9] and foraminotomy [10] which included removal of extensive scar tissue and posterior lumbar interbody fusion. (R.298-300,315-317). The plaintiff tolerated the procedure well, and his post-surgical recovery was uneventful. (R.311-315).

The surgery, however, did not eliminate either the plaintiff's left leg numbness or his persistent low back pain. (R.311-313). In August he reported falling when his leg "gave out," and after an MRI demonstrated a degenerative tear of the meniscus plaintiff underwent a video arthroscopy with a partial arthroscopic menisectomy of the left knee. (R.304-310,392,458,463). His recovery from this outpatient surgery was again uneventful, and on October 5, 2004 Dr. Hereford noted that the plaintiff "should be able to return to work." (R.301-303).

Dr. Hereford's subsequent office notes covering the period between October 2004 and February 2005 show that the plaintiff continued to complain of significant left leg weakness, numbness, and pain.

---

[8] A surgical procedure in which the posterior arch of a vertebra is removed.. Taber's Cyclopedic Medical Dictionary p.996 (16th ed.).

[9] The partial or complete excision of a herniated intervertebral disc. Taber's Cyclopedic Medical Dictionary p.518 (16th ed.)

[10] A surgical enlargement of the intervertebral foramen.

9

(R.301,456-457, 465). Following a repeat lumbar MRI and CT scan (R.390-391,461-462), Dr. Hereford's noted at the time of the plaintiff's December office visit that he had reached maximum medical improvement. (R.457).

Given the plaintiff's continuing left leg problems, he was referred for a repeat neurologic examination by Dr. Puzio. When seen on January 7, 2005, Dr. Puzio found the plaintiff to exhibit continuing L4 redicular symptoms, and ordered an EMG nerve conduction study. (R401-404). Based on his clinical examination, Dr. Puzio was of the opinion that the plaintiff was able to do light duty work only. (R.403-404).

Shortly thereafter, pursuant to a state agency enquiry, Dr. Hereford reported that the plaintiff's knee was fully healed with essentially full range of motion and that post-surgery his lumbar spine was stable with "good" range of motion. (R.419,428). Additionally, Dr. Hereford reported the plaintiff's gait and posture as normal; he stated that the plaintiff exhibited no obvious sensory deficits and that the plaintiff reported continuing left lower extremity weakness. (*Id.*).

The February 10, 2005 EMG and nerve conduction study, however, demonstrated "chronic motor remodeling" in a number of left leg muscles "suggestive of chronic nerve root irritation involving the left L4 and L5 nerve roots" without improvement from the previous studies in 2001 and 2003. (R.431). As reported in Dr. Hereford's February 23, 2005 office note, Dr. Puzio viewed this neurologic deficit to be permanent and doubted that there would be any future improvement. (R.456,465).

10

To ascertain the plaintiff's ability to return to work, he was referred by Dr. Hereford to Augusta Medical Center ("AMC") for an intensive two-day functional capacity evaluation [11] on April 14-15, 2005. (R.445-455). *Inter alia*, this testing demonstrated the plaintiff's multiple postural limitations, including an inability to lift from floor to waist, an inability to weight-bear fully on his left leg in order to accomplish either horizontal or overhead lifting, inability to carry weight any distance safely, an inability to sit comfortably for longer than ten minutes at a time, and a significantly limited ability to rotate in a sitting position. (R.450-452). After reviewing the report, Dr. Hereford noted agreement with its findings. (R.466).

As part of the agency's consideration of the plaintiff's claim, his then available medical records were reviewed by state agency physicians in November 2004 and again in January 2005. In each instance the reviewer concluded that the plaintiff was functionally able to do light work [12] on a regular and sustained basis that required only occasional bending, climbing, balancing, or other postural changes. (R.420-427)

---

[11] The Isernhagen Work System functional capacity evaluation used for this evaluation is a two-day assessment of an individual's functional capabilities. It is designed to measure safely and objectively: repetitive lifting capacity at various levels; repetitive push, pull, and carrying capacities; hand grip strength; tolerance for elevated work; prolonged trunk flexion in sitting and standing; prolonged trunk rotation in sitting and standing; prolonged crawl, knee and sustained crouch positions; repetitive squat; tolerance for prolonged sitting and standing; maximum walking, stairs and stepladder capacity; balance; and hand coordination. (R.447-452).

[12]"*Light work*" is defined in 20 C.F.R. § 404.1567(b) to involve lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category generally requires a good deal of walking or standing, or when it involves sitting most of the time generally involves some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. A job may also be considered light work if it requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" with intermittent sitting. Social Security Ruling ("SSR") 83-10.

At the administrative hearing in February 2006, the plaintiff testified that he had not worked since March 2004, one month prior to his back surgery. (R.503). He stated that the surgery had only "helped [only] a little or not at all," that he continued to have constant significant pain in his low back, left leg and foot, and that he used several prescription medications for pain relief, including Meperidine, hydrocodone, gabapentin, Advil, and Nortriptyline (an anti-depressant). (R.503-507). He stated that prolonged sitting or standing makes the pain worse, and he estimated that he could stand for only about ten minutes at a time and could sit "for 15, maybe 20 minutes, maybe longer" before "getting real stiff." (R.504,508).

The plaintiff was asked about how he spends his time, including the possible contradiction between the physical limitations he described and his continuing hunting and fishing activities. (R.477-478,509,511-513). He testified that he lived alone, prepared his own meals, read books and magazines, watched television, went to the Wal-mart store a couple of times each month, and over the course of the preceding one and one-half years had gone fishing ten or fifteen times and hunting fifteen or twenty times. (R.509-511). He stated that he always went with a family member who could assist him, and that he went only for a limited time. (R.511). He stated that he hunted only with a crossbow which had a cocking mechanism requiring no significant use of upper body strength, and that he used a portable tent type blind which permitted him alternatively to sit or to stand. (R.512-513). This testimony was corroborated by the plaintiff's brother. (R.517,479-495).

Based on an initial hypothetical question which assumed an individual of the plaintiff's age, education and work experience and an assumed functional ability to do light work with only climbing,

balancing, stooping, kneeling, and crawling and with the avoidance of concentrated vibration hazards, the vocational witness testified that such an individual would be capable of performing the demands of a number of jobs at the light exertional level and cited work as a cashier or as a production inspector as two examples. (R.521-522).

As a second hypothetical question in which the ALJ referenced "Exhibit 17F" (the AMC functional capacity evaluation) [13] and indicated that it had determined the plaintiff's functional capacity to be the same as in the first hypothetical with the single addition of a sit/stand option. [14] In response the vocational witness cited jobs working as a security guard, night watchman and parking lot attendant as light work examples such an individual could perform. (R.522).

As final hypothetical questions, the ALJ separately added "pain . . . at a severe level" and an ability to sit only for "approximately 15 to 20 minutes." (R.522-523). In the opinion of the vocational witness, either of these additional restrictions would eliminate any identifiable jobs such an individual could be perform on a regular and sustained basis. (*Id*.).

## IV.    Analysis

In support of his claim of administrative error, the plaintiff presents two principal arguments.

---

[13] See footnote 11.

[14] The opportunity to change positions during the performance of work activity is typically described as the "sit/stand option" or "sit/stand limitation." *See Gibson v. Heckler*, 762 F.2$^d$ 1516, 1518(11th Cir. 1985).

13

First, he contends that there was in fact no substantial evidentiary basis for what was in essence an *ipse dixit* minimization by the ALJ of a medically "objective" functional capacity evaluation. Second, the plaintiff argues that the ALJ erred in failing to include significant limitations in his residual functional capacity determination.

## A.    ALJ's Discount of Functional Capacity Evaluation

The formal report of findings provided to Dr. Hereford at the completion of the two-day functional capacity evaluation contained a number of specific "8 hours per day 5 days per week" limitations. The plaintiff was found to have a total daily sitting tolerance of less than six hours with the additional restriction that he sit for no longer than twenty minutes at a time and have the attendant ability to change positions. (R.452). Similarly, he was found to have a total daily walking/standing tolerance of three hours per day with the additional restrictions that the plaintiff can only walk short distances and cannot stand bearing weight on his left lower extremity. (*Id.*).

As the plaintiff fairly notes, this type of evaluation is designed to provide an objective basis for a determination of an individual's functional limitations. *See Gannon v. Metro. Life Ins. Co.*, 360 F.3[d] 211, 214 (1st Cir. 2004); *Larson v. Old Dominion Freight Line, Inc.*, 2007 U.S.Dist. LEXIS 25003, *22 (MDNC); *Wassen v. Media Gen., Inc.*, 446 F.Supp.2[d] 579, 600 (EDVa, 2006). While the ALJ has the ultimate responsibility, under the regulations, to assess the plaintiff's residual functional capacity, he must explain his assessment and set forth the reasons particular evidence is accepted or rejected. *Arnold v. Sec. of HEW*, 567 F, 2[d] 258, 259 (4th Cir. 1977); *King v. Califano*, 615 F.2d 1018, 1020 (4th

14

Cir. 1980).

Thus, the ALJ's conclusion that the plaintiff's continuing ability to hunt and to fish "proved the fallacy" that the functional assessment must have an evidentiary basis in the record. Although the strict rules of evidence, applicable in the courtroom, do not operate at Social Security hearings so as to bar admission of otherwise pertinent evidence, the administrative record must contain "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971).

In the case now before the court, the administrative record shows (and the plaintiff readily admitted) that he continues to do some hunting and fishing despite his low back and left leg problems. The ability to engage in some physical activities, at one's own pace and in one's own manner, however, is insufficient to establish that an individual can engage in substantial, gainful work activity on a regular and sustained basis. *Higginbotham v. Califano*, 617 F. $2^d$ 1058, 1060 (4th Cir. 1980) (an ability to do housework and shop held not to establish an ability to engage in gainful work activity); *Cornett v. Califano*, 590 F. $2^d$ 91, 94 (4th Cir. 1978) (an "ability to work only a few hours a day or to work only on an intermittent basis" held not to establish an ability to engage in substantial gainful activity); *Bibbs v. Apfel*, 3 Fed. Appx. 759, 763 (10th Cir. 2001) (evidence of an ability to drive to the hearing and to continue to enjoy fishing held not to support the ALJ's non-disability determination); *Smith v. Califano*, 637 F $2^d$ 968 (3d Cir. 1981) (evidence of an ability, on occasion, to go hunting and an ability to go shopping held not to support the ALJ's non-disability decision). *See also Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980) ("An individual does not have to be totally helpless or bedridden in order to be found

15

disabled under the Social Security Act."); *Wilson v. Richardson*, 455 F.2$^d$ 304, 307  (4th Cir. 1972) (An individual's "sporadic and transitory activities may demonstrate not his ability, but his inability to engage in substantial gainful activity.").

Among other things, the ALJ predicated his rejection of the functional capacity evaluation results on the plaintiff's use of a compound bow during deer season in the Fall of 2005. (R.27).  The administrative record simply contains nothing to suggest this, and the testimonial evidence is directly to the contrary.  The plaintiff testified, and his brother confirmed, that he could only use a crossbow with a cocking mechanism which required no significant use of upper body strength. (R.512). Similarly, the ALJ noted that the plaintiff hunted for six and one-half hours at a time (R.27), when nothing in the record supported this assertion.   The plaintiff's quite different testimony was that he could only go for two or three hours "or something like that." (R511).   Additionally, the plaintiff testified without contradiction that he used a ground blind, that his brother had to drag the deer out of the woods, and that he was able to hunt because he had access to his sister's property which meant that he did not have to go into the mountains (R.512,515-517).

The only item in the record which could possibly be said to suggest some factual support for the ALJ's belief that the plaintiff engaged in significant hunting activity is a newspaper photograph and the limited related text,[15] which reported that the plaintiff had killed an 8-point buck during the 2005 deer season. (R.468).

---

[15] No objection was made at the hearing to making this item a part of the administrative record.  It admissibility, therefore, is herein assumed without being decided.

16

Obviously, this newspaper clipping could not testify at the hearing, and it lacked any of the reliability that comes either from first-hand observation or from first-hand testimony subject to cross-examination. Although it may have been technically admissible pursuant to the Supreme Court's holding in *Richardson v. Perales*, , 402 U.S. 389, 402 (1971), by any reasonable measure a single daily newspaper photograph and a line or two of meager text cannot constitute the substantial evidence needed to support an agency's administrative finding. *See generally Eades v. Sec. of HHS*, 1987 U.S. Dist. LEXIS 1469, *9 (DSC). (An uncontested divorce decree stating that no children were born during the marriage found to constitute substantial evidence to rebut a presumption of legitimacy).

The lack of substantial evidence supporting the ALJ's minimization of the AMC functional assessment report is also evident from his mis-characterization of a number of its findings. The ALJ, for example, described the plaintiff's test efforts as "adequate." (R.24). In contrast, the reports records the plaintiff's efforts to have been "work to the maximum of his abilities" and his performance "consistent and reliable." (R.453). Similarly, the ALJ described the test results as demonstrating an ability by the plaintiff to work at a medium exertional level with postural flexibility (R.27), when the test results demonstrated *inter alia* significant left leg weight-bearing and walking/standing deficiencies (R.451-452).

Based on the absence of substantial evidence in support of the ALJ's minimization of the AMC functional assessment, it is recommended that the final decision of the Commissioner be vacated and the case remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further consideration of the record. 42 U.S.C. § 405(g).

Case 5:06-cv-00095-SGW-JGW   Document 13   Filed 06/15/07   Page 17 of 20   Pageid#: 73

**B.     Incomplete Hypothetical Question**

"In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all . . . evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all claimant's impairments." *Walker v. Bowen,* 889 F. 2$^d$ 47, 50 (4th Cir. 1989) (*citations omitted*). Therefore, the Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *Swaim v. Califano,* 599 F.2$^d$ 1309, 1312 (4th Cir. 1979).

The ALJ directly referenced "Exhibit 17F" (the AMC functional capacity assessment) in his second hypothetical question to the vocational witness; however, as posed the question assumed only a person of the plaintiff's age, education and work experience with a capacity to work at a light exertional level and with sit/stand postural option. (R.522). As posed, therefore, it failed to consider any of the lifting and carrying limitations (R.450) and any of the sitting, standing and other postural limitations (R.451-452) identified by this functional assessment.

In short, the question was an incomplete question that failed to permit the vocational witness to consider all of the relevant evidence. *Walker v. Bowen,* 889 F.2$^d$ 47, 50-51 (1989). "The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular [individual] can perform." *Id.* at 50. For such testimony to be relevant or helpful, the hypothetical question must "comprehensively describe" the person's functional limitations; without which, a vocational witness cannot accurately assess whether jobs in fact exist which the individual can perform. *Stephens v. Sec. of HEW,* 603 F.2$^d$ 36,41 (8th Cir. 1979).

18

*Accord Swaim v. Califano*, 599 F.2$^d$ 1309, 1312 (4th Cir. 1979).

Inasmuch as the hypothetical question to the vocational expert in this case did not include all of the relevant exertional limitations, the ALJ's reliance on the vocational expert's testimony in finding residual functional capacity for alternate work is not supported by substantial evidence.

## V.    Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.    The ALJ failed to consider adequately all of the evidence in this case;

2.    The final decision of the Commissioner is not supported by substantial evidence;

3.    It is proper to reverse the Commissioner's decision and to remand the case to the Commissioner, pursuant to "sentence four" of 42 U.S.C. § 405(g), for reconsideration in a manner consistent with this report and recommendation; and

4.    On remand, the parties should have the opportunity to introduce such additional evidence as they may be advised is appropriate.

## VI.    Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order enter DENYING the defendant's motion to dismiss, VACATING the final decision, REMANDING the case to the Commissioner for further proceedings and reconsideration in a manner consistent with this Report and

19

Recommendation and with the parties to have the opportunity to introduce such additional evidence as they may desire, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding United States District Judge.

## VII.    Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof.  **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties**.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

The clerk is directed to transmit copy of this Report and Recommendation to all counsel of record.

DATED: 13th day of June 2007.

_____
United States Magistrate Judge

20